## CHALMERS v. JONES.

1. Where the only contest is as to the proper inference to be drawn from facts not disputed, this court may more freely interfere with the findings by the Circuit Judge than where the truth of the facts is involved.

2. The true meaning may be shown of the word "dollars" found in a contract entered into in 1864; and in this case the circumstances show that it was intended to denote Confederate dollars.

3. A contract shown to have been entered into with reference to Confederate currency must be scaled under the Corbin act where there is no other testimony; but testimony of the comparative values of other property at the same time and place may be introduced to show the real purchasing value of such currency. .

4. A lien for the purchase money under the act of 1791 attached only in cases of sale for partition of intestate's estates.

5. Where land was owned by two tenants in common, and one of them died intestate, after which, under a bill in equity, the land was sold for partition amongst the survivor and the distributees of the deceased, a lien attached for the payment of the purchase money, but only to the extent of the half interest of the intestate in the land.

Before FRASER, J., Newberry, February, 1884.

This was an action by E. P. Chalmers, clerk of the court, against L. J. Jones and G. S. Mower. The opinion states the case.

*Messrs. Y. J. Pope* and *J. F. J. Caldwell,* for appellants.

*Mr. O. L. Schumpert,* contra.

September 29, 1885. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. A certain tract or parcel of land situate in Newberry County was owned in the life-time of the late Chancellor Job Johnstone by the said Job Johnstone and the defendant, Lambert J. Jones. Chancellor Johnstone died intestate in 1862, and shortly thereafter proceedings were instituted by his heirs for the partition of his real estate. In this proceeding partition was also sought of the tract above mentioned between the heirs of the said Job Johnstone and the said Lambert J. Jones, under which this tract was sold, as it seems, in 1864, Mr. Jones being the purchaser, on the completion of which purchase, he executed to the commissioner in equity a bond, with sureties, conditioned for the payment of $700 on February 1, 1865, and $700 on February 1, 1866, with interest on each from February 1, 1864. Upon this bond was entered a credit of the share of Mr. Jones, leaving unpaid the share of the heirs of Chancellor Johnstone.

For this balance the action below was brought in 1877, and the plaintiff sought to make the entire tract specifically liable under the act of 1791. After the commencement of this action, the land was conveyed to the defendant, Mr. Mower, who was then made a party. Two defences were set up—one by Mr. Jones, to wit, that the bond was given with reference to Confederate currency, and therefore should be scaled in accordance with the law as to such contracts; the other by Mr. Mower, who, in addition to the defence of Mr. Jones, which he adopted, denied the alleged lien under the act of 1791.

The case was referred to Mr. Culbreath, as a special master, who, after full testimony, reported on the question of fact, to wit, whether the land was sold with reference to Confederate currency, that it was not so sold, finding Mr. Jones indebted in the sum of $1,761, due November 9, 1883. As to the issue of law, he held that the entire tract stood pledged, under the act of 1791,

for the payment of the purchase money. The case upon this report was heard by his honor, Judge Fraser, who sustained the special master both in his finding of fact and his conclusion of law, and he ordered that plaintiff have leave to enter judgment. and issue execution for the amount stated in the report, with leave to apply for orders directing the sale of the land and the application of the proceeds to the bond, &c.

From this decree the defendants have appealed, assigning error to the judge in his finding of fact on the subject of the Confederate currency, and also in holding that the act of 1791 applied to the case—the defendant Mower claiming that in no event could the statutory lien attach to more than one-half of the land, to wit, that portion which belonged to Chancellor Johnstone. These, then, are the only questions before us, one being a question of fact, and the other a question of law. The case below being a case of equity cognizance, and therefore subject to the appellate jurisdiction of this court, both of the questions mentioned are open and must be considered.

There is little or no contest as to the facts proved in the case, to wit, the time of the sale, the circumstances attending it, the giving of the bond in suit, and the other facts connected with the transaction, and the issue involved in the question of fact upon which the case turns, is not in reference to the facts and circumstances proved so much as it is in reference to the proper inference to be drawn from these facts. There is no doubt but that the defendant executed the bond in question in which he promised to pay the "dollars" mentioned therein, but the question of fact is, what was meant by this term "dollars"? was it employed to indicate Confederate dollars, or was it used in the sense of "lawful money"? Such being the question, the rule which usually restrains this court from interfering with the findings of fact, unless the error is manifest and patent, is not applied so stringently as where the truth of the facts claimed to be proved is involved.

Now, considering this question of inference under this relaxed rule, what is the result? In general, where the intent of parties to a contract is the matter to be ascertained, the terms used in the contract, interpreted according to their ordinary and usual

meaning, afford the best, most appropriate, and reliable means of reaching such intent. In fact, this course is required in most cases involving the construction of papers by one of the long established rules of construction. If this rule was applied here in its full force, the term "dollars" being well understood to mean "lawful money" in its ordinary sense, there could be no doubt as to the proper interpretation of this contract.

Owing, however, to the peculiar financial condition of this State, and of all the Southern States, during the recent war, with reference to the currency then in use, which currency was known to be the basis of many, if not of most, of the contracts entered into during that time, it became manifest at the close of the war that great injustice would be done if such contracts were enforced under the application of the rule above referred to. One of the first acts, therefore, of our first legislative assembly after the war (the convention) was an ordinance to relax this rule in cases of contracts made during the war, by which in such cases the intent of the parties as to the currency intended might be reached, not by the strict and grammatical interpretation of the word "dollars" and such similar words, as formerly, but by the surrounding circumstances and facts attending the transaction, to wit, the character of the consideration, its value, &c.

This contract, then, having been made during the war in the purchase of a tract of land, must be considered and interpreted without regard to the ordinary meaning of the term "dollars" therein. At least that term, in its ordinary meaning, is not to control in defiance of other testimony showing a different intent. Now, it is true, as it appears, that the special master and the Circuit Judge applied this relaxed rule to the case. They discarded the ordinary meaning of the term "dollars," in the first instance, and went into a full examination of all the circumstances attending the sale, and also of the value of the land, numerous witnesses having been examined upon that question. But, notwithstanding this, they both reached the conclusion that the ordinary meaning of the term should govern, and that the parties meant good dollars, as contradistinguished from Confederate dollars.

Was this the proper inference from the admitted facts? It appears that Mr. Jones bought the land in 1864, at public sale,

the price being $81.75 per acre.   He and Chancellor Johnstone bought in 1854 at $24.12 per acre, and we must assume that in 1854 the latter price was its value.   Numerous witnesses were examined by the special master as to the value of the land, some of them valuing it before the war, some in 1864, during the war, and some afterwards.  As is usual, these witnesses differed greatly in their valuations; those valuing it during the war, 1864, ranging from $5 to $60—out of six witnesses, the highest putting it at $12 per acre, and four others at from $50 to $60.   An average from the estimate of the ten would be $26.70, a little more than Mr. Jones and Chancellor Johnstone gave for it in 1854.   Under this valuation, we may safely assume that the value in good money at the sale in 1864 was about what it was when originally bought in 1854, to wit, $24.12.

Now, Mr. Jones purchased at the commissioner's sale in 1864, at $81.75, something more than three times its value as estimated by the average of the witnesses above.   The master in his estimate seems to have been governed by the valuation of the commissioners in partition, made in 1862, who then returned it at about $50 per acre.   Taking either estimate, it is manifest that Mr. Jones contracted to give (if the term "dollars" be strictly construed) considerably more than the true value in good money— in the one case, more than three times; and in the other, nearly twice as much.   Giving this fact its legitimate influence, is it not manifest that Mr. Jones at least was not contracting with reference to good money?   Can it be properly inferred that he expected or intended to bid $81.75 in good money for the land, when he must have known that in such money it was not worth one-third of that sum?   This fact, accompanied with the other facts, to wit, that the sale took place during the war, when there was no other currency in use; when, according to the testimony, the contracts then made in that community were generally met by Confederate currency; when no announcement was made at the sale that in this instance gold was expected—seems to us very strong in support of an inference that Confederate currency was the basis of this contract rather than gold.   And such, in our opinion, should have been the finding below.

But even upon this finding, we do not think that the bond

here should be scaled according to the act known as the "Corbin act." This act determines the value of Confederate currency in the absence of all other testimony showing a different value; but where there is other evidence showing a different value at the time and place of the contract in question, such value should govern. See *Neely* v. *McFadden*, 2 *S. C.*, 169, recognized in *Wilson* v. *Braddy*, 16 *S. C.*, 522. Now, there is testimony in the case that the purchasing value of Confederate money in the community where this contract was made was much greater than that indicated by the Corbin act and at the time mentioned. In the sale of two tracts of land about that time, and in the same vicinity, the difference was not more than five to one. This would scale the debt to some $16.35 per acre in gold, which, with premium on gold added, would perhaps bring the price to about what it sold before the war.

Or, if a more thorough examination was made as to the purchasing value of Confederate money at that time and place, as shown in the purchase and sale of the necessaries of life, such as grain, flour, bacon, and the like articles, it would no doubt be developed that the purchasing power of the Confederate currency was even greater than that indicated by the two sales of land referred to. It would be manifestly unjust that this debt should be scaled under the Corbin act, as this would reduce the purchase money to a mere bagatelle; and yet it would also be unjust to require payment of the full amount bid in good money, as such could not have been the contract of the purchaser. A medium rule like that indicated above would, we hope, accomplish substantial justice, and we are pleased to find that it may be applied in accordance with law, on the return of the case to the court below for a new trial.

Next, did the act of 1791 give a lien upon this land, in whole or in part, for the purchase money? This act has been held in several cases to apply only to sales of real estate of intestates; or, at least, it has been held in three cases in this State, cited below, that the Court of Common Pleas derived its authority to sell lands for partition from this act, and from this act alone; and, further, that under this act it could order sales only in cases of intestacy. *Blocker* v. *Spann*, 2 *Nott & McC.*, 593; *Cromp-*

*ton* v. *Ulmer, Ibid.*, 429; *Witherspoon* v. *Dunlap*, 1 *McCord*, 546. Now, if this be the law of this State under the act of 1791 (and we do not understand that these cases have been overruled), inasmuch as the statutory lien which the plaintiff seeks to enforce here is found in this act, and nowhere else, constituting a part of it, and applying only to the sales which that act authorizes the court to make, it follows necessarily that this lien attaches in sales of land for partition of intestates' estates only.

. We do not think that the case of *Pell* v. *Ball* (1 *Rich. Eq.*, 386) is in conflict with this. That was a case before the old Court of Equity, in which a sale for partition had been ordered below, and the estate not being an intestate estate, the question was raised as to the power of the court to order a sale in such case. The court held, Chancellor Harper delivering the opinion, that notwithstanding the fact that the English Court of Chancery had no power to direct a sale of lands for the purpose of partition, yet that our courts of chancery had assumed jurisdiction in such cases in various instances, even before the passage of the act of 1791, and he refers to the case of *Dinckle* v. *Timrod* (1 *DeSaus.*, 109) as an authority that the court exercised this power long before the act of 1791. And he says that "before this act the court certainly had equal jurisdiction in every case of tenancy, or tenancy in common, as in that of intestate estates." Saying, further: "It is not questioned but that the jurisdiction has been exercised familiarly and habitually for the greater portion of a century, and I believe there is no lawyer at the bar or judge on the bench who cannot verify the prevalence of the practice."

It is true, in seeking a foundation for the jurisdiction of the court in such cases, he went on to discuss somewhat the act of 1791, and he said: "There are some other views which it is hardly necessary to take. The court may have extended the equity of the statute of 1791 in relation to intestate estates to all other cases of joint tenancy, and tenancy in common, according to a well known practice of the English courts, as being within the mischief, or cause of the making of the act." And he remarked, further, that the words of the act of 1791, to wit, "distributive share," were not necessarily confined to intestate estates, but were capable of a construction, which would embrace tenants in common.

It must be remembered that the court below in that case had ordered a sale, though the estate was not an intestate estate, and Chancellor Harper was seeking authority for the Chancery Court to order a sale in such case. And he concluded that it had authority, first from long practice, and second, perhaps, under the equity of the act of 1791, and possibly from an expansion of the words "distributive share" therein, so as to include joint tenants and tenants in common. But there was no distinct ruling upon these latter points, and certainly no overruling of the three cases, *supra*, in which the Appeal Court had held that the act of 1791 applied only to sales in cases of intestacy, so far as the Court of Common Pleas could take jurisdiction.

This being the law, the statutory lien which that act provides can only attach in sales made for partition in cases of intestacy.

The main question, then, in this case is, was the sale below ordered in a case of intestacy? There is no doubt than Chancellor Johnstone died intestate as to this land, and that it was sold under a bill filed for the purpose of partition. It is true that Mr. Jones owned one-half of the land, and therefore, before Chancellor Johnstone's interest could be distributed among his heirs at law, it had to be separated from the interest of Mr. Jones. This, no doubt, might have been done by an independent bill between Mr. Jones and the heirs, and then Chancellor Johnstone's portion might have been partitioned by sale between his heirs by another bill. Suppose this had been done, would not the statutory lien have attached to the sale thus ordered? Most certainly, because the property was intestate property, and sold under the provisions of the act of 1791.

Now, has not this been done in substance? The parties did not see proper to institute a separate action for the separation of the interests of Mr. Jones and Chancellor Johnstone, but they embraced this land in the bill which was filed for the partition of the other real estate of Chancellor Johnstone, in which his heirs alone were interested. This bill may have been defective to the extent of thus embracing a separate matter as multifarious, or as misjoinder of actions, but no objection was made, and it proceeded to judgment and sale. So far as this particular land was involved, the object of the bill was to separate the interest of

Chancellor Johnstone from that of Mr. Jones, and then to distribute that interest among the heirs of Chancellor Johnstone, and the court, by the consent of all parties, having concluded that these ends could best be accomplished by the sale of the entire tract, so ordered, Mr. Jones getting his part by a credit on the bond which he gave as purchaser, and the remainder of the bond standing for the heirs at law.

Now, we have seen that it is the sale of intestate property only, upon which a lien attaches to the property sold for the purchase money under the act of 1791. Here the only portion of the property sold as intestate property was the half that belonged to Chancellor Johnstone. This was sold for the purpose of distribution among his heirs. True, to reach this interest, the half belonging to Mr. Jones was also sold at the same time, no one objecting; but Mr. Jones's half was not intestate property; and while under the terms of the act the lien must attach to the half interest of Chancellor Johnstone, yet we cannot see how it could attach to that of Mr. Jones. There may be difficulty in applying this doctrine to the land in question, but that matter is not before us.

It is the judgment of this court that the judgment of the Circuit Court be reversed, and that the case be remanded to be enforced in accordance with the views herein above, with the privilege on the part of both plaintiff and defendant to introduce testimony (if so advised) as to the purchasing power of Confederate money at and about the time and place of the sale of the land in question here.

MR. JUSTICE McIVER concurred.

MR. JUSTICE McGOWAN. I concur in the result. Upon the point sent back, the inquiry should be, what was the relative value of Confederate money to national currency at the time and place of sale? Such relative value to be ascertained "by the application of the act of 1869, aided, controlled, or qualified by the evidence as to such value." See *Parker v. Wilson*, 5 S. C., 493.